### ÆTNA LIFE INS. CO. v. ROBINSON.
### (No. 1109.)

(Court of Civil Appeals of Texas. Beaumont. May 14, 1924. Rehearing Denied May 21, 1924.)

**1. Trial ⟲219—Refusal of requested definition of "accidental means" held erroneous.**

On issue whether insured slipped and fell or fell because of illness, giving an ordinary definition of "accident" and refusal to instruct that "accidental means" meant that the element of accident must consist in that which produced the accident, rather than mere fact of injury, *held* error.

**2. Insurance ⟲455—Fall because of illness not necessarily occasioned by "accidental means" within policy.**

If insured slipped and fell, inflicting fatal injuries, his death would have been occasioned by "accidental means"; but if, because of a fainting spell or bodily infirmity, he fell, though the injury may have been the sole cause of his death, it would not necessarily be occasioned by accidental means, for, if such injury would naturally follow from a fall so occasioned, death would not be accidental, within the policy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Accidental Means.]

**3. Trial ⟲350(4)—Refusal to submit defensive issue that insured's death was due to apoplexy held erroneous.**

In an action on a policy for accidental death, where evidence raised an issue that insured's death might be due to apoplexy, court's refusal to submit such issue was error; defendant being entitled to an affirmative submission of all ultimate defensive facts raised by evidence.

**4. Evidence ⟲547—Court's refusal to permit attorney to testify as to concession against suggested fee held erroneous.**

Refusal to permit an attorney, testifying as an expert as to a reasonable attorney's fee to be allowed plaintiff, to state that he would make a concession against his suggested fee in view that same attorney was to represent plaintiff in a similar pending case, was error, especially since jury allowed full amount of suggested fee.

**5. Insurance ⟲549—Insurer not entitled to autopsy of insured's body made two weeks after burial.**

Insurer was not entitled to an autopsy of insured's body, where demand was not made until two weeks after burial, though insurer was not notified of insured's death until after his burial, and long delay in asking for an autopsy was caused by slow communications, where insured's body was in such condition as to reflect with reasonable certainty the cause of his death, as far as it could have been ascertained by an autopsy performed immediately after his death.

**6. Evidence ⟲473—Admissibility of witness' testimony not affected because stating a conclusion.**

Admissibility of witness' testimony as to marks upon a pavement where a person had been injured, though he gave his testimony in the form of a conclusion, was not erroneous, since a witness may testify as to the impressions produced upon his mind by the facts as he saw them.

**7. Insurance ⟲662(1)—Refusal of testimony as to demand for autopsy held not erroneous.**

Accident policy not providing for autopsy, court did not err in excluding testimony of demand for autopsy on day following insured's funeral; such demand not creating a breach of the contract, so as to forfeit it.

**8. Insurance ⟲662(1)—Beneficiary's testimony that she would have refused autopsy of insured's body held properly refused.**

In an action on a policy for accidental death, beneficiary's testimony that she would have refused an autopsy of insured's body, if demand had been made before body was interred, was properly excluded, where condition for autopsy was not in policy.

**9. Insurance ⟲549—Warranty strictly construed against those seeking their breach.**

Warranties providing for forfeiture of a policy upon failure to allow insurer to examine insured's body after injury are strictly construed against those seeking their breach, and can be only invoked, when the facts come strictly within provisions of warranty.

---

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Action by Mrs. Mary Ellen Robinson against the Ætna Life Insurance Company. Judgment for plaintiff, and defendant appeals. Reversed.

Baker, Botts, Parker & Garwood, of Houston, for appellant.

B. F. Louis, of Houston, for appellee.

WALKER, J. On the 19th day of February, 1912, appellant issued to Charles William Robinson, the husband of appellee, an accident policy in the principal sum of $7,500. Mr. Robinson died on the 23d day of January, 1922, with the policy in full force and effect. On appellant's refusal to pay the amount claimed under the accident features of the policy, appellee instituted this suit, and was awarded judgment for $7,500, the amount of the policy contract, $337.50 interest, $900 statutory penalty, and $2,500 attorney's fees. There was testimony on all

the circumstances embodied by appellant in the following hypothetical question:

"I want to ask you a hypothetical question, and don't answer it until plaintiff's counsel has the opportunity to object: Assuming that a white man between 69 and 71 years of age, engaged in the rice or grain brokerage business, has a wife and several grown children, who had not had any illness in the last 15 or 20 years sufficient to cause him to take to his bed or to call a physician for that illness, with the exception of an attack of neuralgia which was supposed to have been brought on by some trouble with his teeth, and which ceased to disturb him after the dentist worked on his teeth, who had a dizzy spell, or who became dizzy and staggered, about a year before his death, after drinking a full goblet of wine in a room in his home, and immediately thereafter going into a room where there was a heater with a fire in it, and was then taken or assisted upstairs and to bed, got up the next morning without evidencing any apparent ill effects, who drank wine occasionally at home, but not to excess, who sometimes walked to his work and sometimes rode in a jitney, and sometimes in a street car; assuming that this old man left his home out on Travis street at about 9 o'clock on the morning of January 23d, of this year, after having eaten his breakfast as usual, and after having gone into the yard with his wife and procured a rose, or other flower, and started walking south on Travis street, turning at the first corner, which was Hadley, and going westward, and was not seen any more, so far as known, until about 20 to 40 minutes later, at which time he was found lying on his back in Travis street with his feet against the curb, or approximately against the curb, one knee slightly raised, grasping a dollar bill, or some other similar object, in one hand, with a cane lying near him, and who, when picked up, was carried to the hospital in an automobile, where he died about the time of arrival, which was about 10 minutes after he was picked up; assuming these things, and assuming, further, that there was a cut on the back of his head just to the right of the occipital bone, from ¾ to 1½ inches in length, or possibly 2, which reached through the scalp to the bone, so that a person putting his finger into the cut could feel the skull, but could not, so far as he could tell, discover any crushing or breaking of the skull perceptible to the feel of his finger; and assuming, further, that there was a considerable amount of blood at the place in the street where this man's head was, the street at that place being paved with either wooden block or brick (there is some difference about that), and that no one saw him fall and no one there actually observed whether he fell, or how he got into the position in which he was found; we do not know what he had for breakfast or for dinner on the preceding evening; and assuming, further, when the undertaker went to embalm the body, some slight amount of embalming fluid oozed out from the cut in the back of his head, just mentioned, which oozing was between the skull and the outer covering, skin covering; assuming that the body was embalmed and buried at about 11 o'clock a. m. or 12 o'clock on the day following this, that is, about 26 hours after death; and assuming, further, that the deceased having some insurance,

commonly called accident insurance, and no autopsy or post mortem examination was had; assuming that the man did not speak from the time he was found until he died—whatever number of minutes that was. * * *"

The policy insured the said Charles William Robinson "against loss as herein defined resulting directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental means" (excluding suicide, which is not involved in this case), and said contract provided further that—

"* * * If such injury alone result within ninety days from the date of accident in any of the losses described below, the company will pay the sum specified opposite such loss."

The contract further provided:

"The company shall have the right and opportunity to examine the body of the assured when and so often as it requires in the case of injury, and also have the right and opportunity to make an autopsy to determine the cause of death when it so requires."

Said contract further provides in paragraph E, part XIII:

"* * * A failure to comply with any of the requirements contained herein shall invalidate all claims under this policy."

The following special issues were submitted to the jury, and answered as indicated:

"Special Issue No. 1. Was, or was not, the death of Charles W. Robinson, the insured under the policy of insurance sued on herein, due directly and independently of all other causes, from bodily injuries effected solely through external, violent and accidental means? You will answer, 'It was,' or, 'It was not,' as the case may be." Answer: "It was."

"Special Issue No. 2. Was, or was not, the death of Charles W. Robinson, the insured, caused by his falling accidentally and striking the back of his head upon the edge of the curb or some unknown substance upon the street, causing the cut upon the back of his head? You will answer, 'It was,' or, 'It was not,' as the case may be." Answer: "It was."

"Special Issue No. 3. What, under all the facts and circumstances in this case, would be a reasonable attorney fee to be allowed plaintiff for the prosecution of this suit? You will answer by stating the amount." Answer: "$2,500.00."

"Special Issue No. 4. Was, or was not, the death of Charles W. Robinson, the insured, caused by a blow on the back of his head which caused the wound or cut thereon as shown by the evidence? You will answer, 'It was,' or, 'It was not,' as the case may be." Answer: "It was."

## Opinion.

[1] Appellant, in connection with a proper charge on the burden of proof, requested the court to submit to the jury the following definition of the term "effected solely through external means":

"The term 'effected solely through external, violent and accidental means' means that the element of accident must consist in that which produces the injury rather than in the mere fact that an injury occurs."

This charge was refused, and in lieu thereof the court submitted to the jury the following definitions of the terms "accidental" and "accident":

"You are further charged in this case that the terms 'accident' and 'accidental,' as used in the charge and special issues submitted to you by the court, are employed in their ordinary and popular sense, as meaning happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected; an event which takes place without the foresight or expectation of the person acted upon."

Appellant's definition of the term "accidental means" should have been given. Our Supreme Court, following the Supreme Court of the United States, draws a distinction between death by "accidental means" and an "accidental death." In Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S. W. 673, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517, it was said:

"The word 'means' is employed in the policy in the sense of 'cause'; the phrase 'due to accidental means' is one of qualification; and the purpose of its use in the ordinary accident policy is to limit the liability of the insurer to injuries effected by an accidental cause, as distinguished from those which are merely accidental in their result. It is generally recognized, as it should be, that where a man undertakes to do a certain thing by a particular means, and the result of his act is such as follows, in not an unusual or unexpected way, from the means voluntarily used, it cannot be said to be due to an accidental cause, though, in the sense that it was not intended, an accidental result is the consequence. In the numerous adjudicated cases upon the subject, therefore, it is determined that where by the terms of the contract the risk insured against is an injury effected by 'accidental means,' the element of accident must consist in that which produces the injury, rather than in the mere fact that an injury occurs."

And, again, it was said, in Pledger v. Business Men's Accident Ass'n (Tex. Com. App.) 228 S. W. 110:

" * * * Death is accidental if the result is an accident, whether due to accidental means or not. * * * The result is due to accidental means, if in the act preceding the injury something unforeseen, unusual and unexpected occurs which produces the result. * * * Death caused by accidental means is an accidental death; but an accidental death may or may not be the result of accidental means."

[2] On the facts of this case, if Robinson slipped and fell upon the pavement, inflicting the injuries from which he died, his death would have been occasioned by "accidental means"; but if because of a fainting spell, or some other bodily infirmity, he was caused to fall, thereby inflicting the injury, though the injury may have been the sole cause of his death, it would not necessarily follow that the death was occasioned by accidental means. If such an injury would naturally follow from a fall occasioned by a fainting spell or other bodily injury, not accidental in its nature, then the death would not be accidental, within the meaning of the policy and would not be covered by the conditions of this policy.

[3] In addition to the circumstances raised by the evidence in this case, the evidence of the expert physicians who testified herein raised the issue that Robinson's death might have resulted from apoplexy. Appellant requested the submission to the jury of the following issue, which was refused:

"Did apoplexy cause or contribute directly to the death of Charles W. Robinson?"

The refusal of this issue was error. It is now too well established to require a review of authorities that a defendant, on a trial on special issues, as well as the general issue, should have an affirmative submission of all the ultimate defensive facts raised by the evidence. Railway v. Lynch (Tex. Civ. App.) 208 S. W. 714. It is not enough that a negation of such defensive facts is necessarily involved from the answers given by the jury to the issues actually submitted. The defensive issues themselves, in an affirmative way, should go to the jury. Armour & Co. v. Morgan, 108 Tex. 417, 194 S. W. 942. Our Supreme Court, in that case, said:

"It is no answer to say that the jury found that the injuries resulted from the personal negligence of the company in failing to safeguard the machinery, for they might not have so found, if they had been allowed to find otherwise in the event they should believe the injuries were caused by the act of a fellow servant."

See, also, Railway Co. v. Washington, 94 Tex. 510, 63 S. W. 534; Railway Co. v. Gorman, 112 Tex. 147, 245 S. W. 419; Payne v. Douglas (Tex. Civ. App.) 241 S. W. 240; Gammage v. Gamer Co. (Tex. Com. App.) 213 S. W. 930; Railway Co. v. Wallace (Tex. Com. App.) 206 S. W. 505; Sherrill v. Union Lumber Co. (Tex. Civ. App.) 207 S. W. 149.

On the record before us we cannot say that the other requested issues on the cause of the death were raised by the evidence.

[4] Appellee introduced Judge Howard, a very prominent attorney of the Houston bar, as an expert on the amount of the proper fee for prosecuting this case. Judge Howard's testimony was to the effect that $2,500 would be a reasonable fee. Thereupon appellant proposed to show that another case was pending involving the same issues of law and fact as involved in this case, and to ask Judge Howard what concession he would

make, as an expert, in the fee suggested, in view of the fact that the same lawyer represented appellee in both cases, and that he could use the result of his investigation in one case in the trial of. the other. On this statement of facts, Judge Howard would have testified, had the court permitted him to do so, that he would make a concession of $500 as against his suggested fee of $2,500. This testimony was admissible, and should have been received by the court, especially in view of the fact that the jury allowed the full amount of the fee suggested by Judge Howard as a proper charge.

[5] Appellant was not entitled to an autopsy at the time and under the conditions reflected by this record. The demand was not made until about two weeks after the deceased had been buried. There was no provision in the contract expressly authorizing an autopsy after burial. We find further that appellant did not know of the death until after the deceased was buried; that appellee or her agents took no step to notify appellant of the death of Mr. Robinson until after his burial; and that the long delay in asking for the autopsy was probably caused by delay in the mail between appellant and its agents and the failure of the telegraph company to deliver a telegram passing between the agents of appellant, and that the body of deceased was in such condition, because of the character of the coffin in which it was buried and that it had been embalmed, as to reflect with reasonable certainty the cause of his death, as far as that could have been ascertained by an autopsy performed immediately after his death  The facts of this case on this issue are almost identical with United States Fidelity & Guaranty Co. v. Hood, 124 Miss. 548, 87 South. 115, 15 A. L. R. 605, decided by the Supreme Court of Mississippi in 1921.  In that case it was said:

- "It will be seen from the above that no demand was made for an autopsy until after the burial, but the appellant insists that under its contract it had the right to make an autopsy, even though it required exhuming the body to do so.

"There are a number of authorities which on their facts have held that the request for an autopsy came too late, but none of the authorities cited have passed specifically upon the question as to whether a demand for an autopsy after interment and. its refusal would constitute a defense to the policy.  The general trend of the authorities is to the effect that the demand must be seasonably made. It is insisted here that the company had no notice of the necessity for an autopsy or the probable results that might follow an autopsy until after the interment, and that the right was not waived because the facts were not communicated to the company by the beneficiary until after the interment was made, and that it made the request seasonably after securing the information that an autopsy would probably show the nonliability of the company under the policy.

"The company may, of course, confide to such of its officers as it may desire the sole power of making a demand for an autopsy in such cases, and may refuse the local agents any authority to either demand an autopsy or to waive the benefits. But where it does so it is nevertheless bound by knowledge coming to the knowledge of its agent and must exercise such reasonable diligence as the circumstances call for. In the present case it was advised of the seriousness of the injury prior to the death of the deceased, and knowledge of his death came to its agents in ample time, if promptly communicated, for it to have made the demand.

"Provisions of contract of this kind which are prepared by the insurer are to be construed most strongly against the insurer and in favor of the insured. Where there is no provision in the contract itself giving the right of an autopsy after interment, the court will construe the provisions to mean that an autopsy must be, demanded and performed prior to interment, and, if the insurer desires to avail itself of this privilege, it must so arrange and provide for information to be given of the death prior to the interment."

Eminent counsel for both sides to this appeal stated on oral argument that they had personally examined every reported decision that they could find on this question, and that no court had ever reversed a trial court in a civil case for refusing an autopsy. The provisions of an insurance contract requiring an autopsy after death on penalty of forfeiture would be so shocking to the sensibilities of the relatives of the deceased that this court can well understand why no appellate court has ever sustained the demand of an insurance company to enter the tomb and withdraw the decomposing bodies of the dead for the purpose of mutilation by an autopsy.

[6] The court did not err in permitting plaintiff's witness T. W. Elkins to answer the following question:

"Did you observe any marks upon the pavement or anything around there?

"The only mark I noticed was a little mark right on of the curb right on the street—right off of the curb. It looked as though where he tried to catch with his walking cane and it slipped, you know."

This answer was objected to on the ground that it was "clearly a mere conclusion of the witness." We believe the ruling of the court in the admission of this testimony is fully sustained by the reported cases. In the case of McCabe v. San Antonio Traction Co., 39 Tex. Civ App. 614, 88 S. W. 387, a witness had testified:

"Well, the lady must have slipped and fell, because she couldn't fall any other way. * * * I said that she slipped, because that was the natural way for her to fall. * * * If a man falls on the street, it is presumed he slipped."

With respect to an objection that this was a conclusion of the witness, the court said;

"It is an exception to the general rule that witnesses cannot give conclusions or opinions that evidence of common observers, testifying to the results of their observation, made at the time, in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury, is admissible."

Of course, this testimony of the witness was a mere conclusion, but when it is not possible for a witness to picture in words the scene as it actually existed, the general rule permits him to testify as to the impression produced upon his mind by the facts as he saw them. The rule, with a brief of authorities, is thus given by Wigmore on Evidence (2d Ed.) § 1924:

"The second group of persons to whom the opinion rule has to be applied (ante, § 1918) includes those who concededly have *no greater skill* than the jury in drawing inferences from the kind of data in question. Such a witness' inferences are inadmissible when the jury can be put into a position of equal vantage for drawing them—in other words, when *by the mere words and gestures of the witness the data he has observed can be so reproduced that the jurors have those data as fully and exactly as the witness had them at the time he formed his opinion.* This test has been variously phrased in judicial language:

"1823, Gibson, J., in Cornell v. Green, 10 Serg. & R. 16: 'I take it that whenever the facts from which a witness received an impression are too evanescent in their nature to be recollected, or are too complicated to be separated and distinctly narrated, his impression from these facts become evidence.'

"1853, Johnson, J., in Clark v. Baird, 9 N. Y. 185: 'Evidence of opinion is also recognized as proper, on the same ground of necessity, in cases where language is not adapted to convey those circumstances on which the judgment must be formed.'

"1858, Campbell, J., in Evans v. People, 12 Mich. 35: 'Many cases exist in which it is impossible by any description, however graphic, to explain things so as to enable any one but the witness himself to see or comprehend them as they would have been seen or comprehended could the jury have occupied his position of observation.'

"1875, Endicott, J., in Com. v. Sturtivant, 117 Mass. 122: '[The condition is that] the subject-matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time.'

"1873, Peck, J., in Bates v. Sharon, 45 Vt. 481: '[Opinion is admitted] where the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them without the aid of the judgment or opinion of the witness who has had the benefit of personal observation.'

"It is in the application of this test that the opinion rule really breaks down, as an aid in the investigation of truth. In the vast majority of rulings of exclusion, the data observed by the witness could not, in any liberal and accurate view, be really reproduced to the jury by the witness' words and gestures. The error of the judges consists in giving too much credit to the possibility of such reproduction. What is chiefly wrong is by no means the test itself, but the illiberal and quibbling application of it.

"In one state, at least, the test has been so broadly phrased as to eliminate much risk of technical use:

"1919, Young, J., in Paquette v. Connecticut V. L. Co., 79 N. H. 288, 109 Atl. 836: 'The test usually applied in this state to determine the admissibility of opinion evidence is not to inquire whether the issue to which it relates is for the jury; nor whether it is a matter of daily occurrence and open to common observation; but whether the witness' knowledge of the matter in question will probably aid the triers in their search for the truth.' "

[7-9] The court did not err in excluding the testimony of an adjuster of another insurance company that he made demand of appellee for an autopsy the day following her husband's funeral. Such a demand, though this appellant might have had the benefit thereof in the trial of this case, could not be such a breach of this contract as to forfeit it in appellant's favor; nor did the court err in excluding the testimony of appellee, to the effect that she would have refused the autopsy if the demand had been made after the body was returned from the undertaking parlors and before interment. No such condition existed, and a warranty is not breached upon a theory of facts which do not exist. Warranties such as involved in this case are strictly construed against those seeking the breach thereof, and can be invoked only when the facts come strictly within the provisions of the warranty in issue. Errors assigned and not discussed are overruled as being within well-recognized principles.

Appellant also challenges the verdict of the jury as being without support in the evidence. As we are reversing this case, for the reasons given, and as the case must be tried again, it would not be proper for us to express our conclusions on the effect of the evidence, as it may be different upon another trial.