# CITY OF BEAUMONT v. KANE.

## No. 2013.

Court of Civil Appeals of Texas. Beaumont. Nov. 28, 1930.

Rehearing Denied Dec. 11, 1930.

John C. Jackson, City Atty., of Beaumont, for appellant.

Howth, Adams & Hart, and Benckenstein & Benckenstein, all of Beaumont, for appellee.

WALKER, J.

On the night of July 3, 1926, appellee, W. A. Kane, drove his automobile down Pearl street, Beaumont, across Austin street, onto the approach to the city wharf and across the wharf into the Neches river. At that point the water in the river was about twenty-three feet deep and about fifteen feet below the wharf. This suit was by appellee against appellant, the city of Beaumont, for $30,000 as damages suffered by him on the facts stated. As grounds of negligence he pleaded that the city of Beaumont failed to:

"Provide the foot of Pearl Street at the southern edge of the wharf along the Neches River with such lights, guards, warnings, signals and other devices such as might and would reasonably give notice and warning to persons."

In addition to its general and special exceptions and general denial, appellant pleaded against appellee the issue of contributory negligence. All issues of negligence submitted to the jury were found in appellee's favor and he was acquitted of contributory negli-

gence. For the personal injuries suffered by him the jury awarded appellee $11,500 and for the damages to his automobile $750. Judgment was accordingly entered in his favor, motion for new trial overruled, and this appeal regularly prosecuted.

Appellant's first proposition is that the court erred in refusing to instruct a verdict in its behalf. The facts of this proposition are substantially as follows: Pearl street runs through the principal business section of the city about twelve blocks south from its intersection with Calder avenue to its intersection with Austin street, where it ends. It is paved its full length from its Calder avenue intersection across its intersection with Austin street. Austin street is paved for several blocks west of its intersection with Pearl street. From the south line of the intersection of Austin street to the edge of the wharf is about 135 feet. About 65 feet of this distance from Pearl street is covered with shell, and the balance of the way to the edge of the wharf with plank. On the date mentioned, and long prior thereto, the general public drove down Pearl street, across Austin street, across the shell and plank to the edge of the wharf. There was no restriction against this privilege. There was no obstruction between the south side of Austin street and the river. One of the principal thoroughfares of the city was down Pearl street to a right turn into Austin street; one block west on Austin street to a left turn into Orleans street; down Orleans street parallel with the west bank of the Neches river about one thousand feet into Sabine Pass avenue; and then down Sabine Pass avenue into the Port Arthur road. Explaining the ownership and control of the wharf and the wharf property and the physical conditions of the intersection of Pearl and Austin streets, we quote as follows from the testimony of the city attorney, Hon. J. B. Morris:

"I am city attorney for the City of Beaumont, and have been city attorney nearly six years. They were building the present wharf at the foot of Pearl Street, I believe, in 1924, when I went into office. John Jacobs, of Galveston, built that wharf. The City of Beaumont had it built. The City of Beaumont owns that wharf, and they built it, or had it built, and they maintain it and control it, and have ever since it has been there. That is wharf property, but it is no part of any public street. Pearl street stops at the South line of Austin Street; and from there on down we have the wharves and docks. We use that to stack lumber and cross ties and other cargo intended for loading on ships. The shelled portion joins the street and extends on down to the planking of the wharf. Unless you would call the rough surface of that shell an obstruction, there is not any obstruction between the end of the street and the docks, or was not at that time, such as rails or guards, and so forth. There were no rails, lights or warnings of any kind there at that time; there is now. There is a fence across the end of the wharf now. I couldn't tell you what that was put there for. I couldn't tell you when it was put there. I suppose it was put there probably six months ago. I do not know what that fence is there for; have no idea. I couldn't tell you what purpose it serves. They have a sign up there 'Trespassers are not allowed on the property,' also. I think that sign was put there about six months ago. It was not there before Mr. Kane got hurt. I think the port director began to kick about folks leaving cigarette stubs and cigar stubs down there, and was afraid that they would burn up the wharf, and prevailed on the dock and wharf commission to put up the sign and the fence. I don't recall what other change has been brought about there since the injury to Kane at the foot of Pearl Street in the way of lights. There is a yellow light up in the middle of the street at the end of Pearl Street; at the end of the paving on Pearl Street. I don't think that was there before Kane got hurt. As I remember, that light is on the edge of the street; about the center of the street but on the south edge; in the center of the end of the street. The shell joins on to the paved portion at the end of the street; that would be on a line with the south line of Austin, which intersects it on the west. I think this white way, consisting of double lights on steel poles, was put in before I became City Attorney; I am quite sure it was. I think that yellow light burns night and day; I am not sure about that. In our traffic light system, the yellow light indicates 'caution.' I don't know whether you would call it a danger signal or not."

On the night in question immediately south of the intersection of Pearl and Austin streets on the right was a pile of dirt and on the left piles of cross-ties practically from Austin street to the river. But between the sand on the right and the ties on the left was an open space variously estimated by the witnesses from twenty to forty feet wide, extending directly from the end of Pearl street on to the edge of the wharf. For the first block north of its intersection with Austin street, Pearl street was dimly lighted, but north of that point well lighted. South of Austin street on the right side of the extension of Pearl street was a large brick building designated in the record as Kewpie Ice Cream building with a glass front through which lights were shining on the night in question. Straight across the river from the end of Pearl street about one thousand feet distant was a row of lights in houses, in the streets, and especially in Hotel Dieu, a large hospital immediately across the river from the end of Pearl street. In explanation of this statement, it should be said that one block west of the point on the wharf in issue, on the eastern side of Orleans street, the river makes almost a right angle turn to

the south running with Orleans street south for about one thousand feet, at which point it makes a sharp turn to the east. Driving down Pearl street the lights across the river become visible after you cross Austin street. But on a dark rainy night, such as the one in question, the driver cannot see the river until he reaches a point within a few feet of the edge of the wharf. Between the edge of the wharf, over which appellee drove his car, and the other side of the river, is Harbor Island, around which the river bends in making the turn just described. Orleans street is one block, or about three hundred feet, immediately west of Pearl street and extends through the business section of the town parallel with Pearl street to Austin street, thence with the west bank of the river, as above stated. Dr. Tatum thus described the approach to the wharf down Pearl street:

"I have been observing and driving on Pearl Street ever since I have been in Beaumont. I have had occasion to look south on Pearl Street as you drive south on Pearl Street. On a dark, rainy night, if a person driving south on Pearl Street was just absolutely gazing, expecting to find the street ending in the river, he probably would see it, but just a stranger, driving down there and not expecting it, *and it being such a sudden turn, I don't see any reason why a man wouldn't drive right on off.*"

Dale Broussard, on the same issue, testified:

"Traveling down Pearl Street south, to the foot of Pearl Street and even on the wharf, on a dark night, I wouldn't think you could see the river from a motor vehicle."

On the same issue Mrs. Nita Richardson testified:

"I went down there about 1 or 2 o'clock in the night. I did not notice any street lights down there; there wasn't any lights there; it was dark as Egypt. I could not see the river from the foot of Pearl Street or even after I got on the wharf; it looked like all street to me. I noticed that night what was the appearance looking south at the foot of Pearl Street there by the Kewpie Ice Cream parlor, to determine whether or not it appeared or did not appear to be a continuation of Pearl Street as far as you could see, and it did have that appearance."

We quote as follows from the testimony of appellee:

"My name is W. A. Kane. I am thirty-five years old, and my occupation is that of oil field worker. Before I was injured I was an oil field driller. I received an injury in the City of Beaumont. Those injuries were received on the 3rd of July, 1926, between 9:30 and 10 o'clock at night. It was a dark rainy night. I was a stranger in Beaumont at that time. I happened to be over here because I came over to see some people out on Magnolia Avenue. At that time I was living in Ged, Louisiana.

" * * * I did not arrive in Beaumont on July 3rd, but came over the day before. I came to Beaumont from Ged, Louisiana, on July 2nd, on a visit to some friends. On the night of the 3rd of July, 1926, between 9:30 and ten o'clock I received an injury. At the time I was going out to a dancehall called the Idlewild. That dancehall was on the Port Arthur road. I had been out there before on that same night, around eight or nine o'clock.

" * * * I now know what Orleans Street is, and where it is, and where Pearl Street is; I have become acquainted with those streets since I was hurt. When I went out to the dancehall the first time I went out Orleans Street. That is the street paralleling Pearl Street and west of Pearl. When I came back, I came right back Orleans Street. The reason I came back is that I brought one of the ladies back, the girl that was with me, back to the home. Her name was Miss Richardson. When I started back out there, the purpose in going out there was to get the rest of the family. I was driving an automobile, which was an Oldsmobile coach, a car with two seats in it. I had owned that car about ninety days till the time of the injury to myself. When I started back to go to Idlewild, I now know what street I went out on to get back on the Port Arthur road. I came down Pearl Street. At that time I did not know what street I was on. I thought I was on Orleans Street. I thought I was on the same street that I went out on, though at that time I did not know the name of that street. I was not acquainted with the streets of Beaumont at that time. I proceeded down Pearl Street in a southerly direction on the night the injury occurred. It was raining and dark. It was very dark and stormy. It was raining mighty hard. I was in a closed car with all the windows up, or completely closed. After I got down Pearl Street and proceeded down below the courthouse I did not recognize or know anything about the situation down there. I did not know that the street ended abruptly in the river. I did not know that there was a right hand turn for people going out to avoid going into the river. I could not see those turns during that black rainy night. I drove right on; drove on by, thinking I was going straight out, and drove on there, and when I got about eight or ten feet of the water, the lights showed on the water. I discovered that there was water there at the end of that street when I was about eight or ten feet away, when I got within eight or ten feet. When I discovered that I put my brake on. I was looking ahead as I was driving.

"As I was driving south on Pearl Street and just before I discovered that there was a river or some water there, before I plunged

**238**

into the river, the appearance, under the facts and circumstances, were that that was a continuation of the road I was traveling. What I saw there that indicated to me that the street continued on down was this: There was houses on the side of the road, and far ahead there was a line of them, just lit up—lights. As I proceeded down Pearl Street that night I could not see the river there until I got right on it. I thought I was on the same road I went out on before. So far as I saw, there was not any guard rails or fences, warning lights or danger signals of any kind at the foot of Pearl Street or at any place on Pearl Street, indicating danger ahead, at that time. There were none there.

"I got down there about eight or ten feet from the end of the wharf and the lights reflected on the water. Then I knew there was something wrong there, and I threw my brake on. The car just skidded. Those were two-wheel brakes, and the car just skidded right on it there and turned a complete flip into the river. My car went into the river. The water, I found when I plunged in there, was deep at that point. When the car hit the flip the steering wheel hit me right across the nose. I broke the glass in the door, and grabbed hold of the door and pulled out through that opening. I broke the glass in the door; I did not try to open the door, but broke the window in the door.

"* * * When I was going down Pearl Street, I was driving that night about 15 miles an hour. Up to the time I put my brakes on, I was driving about 15 miles an hour. Putting on the brakes slowed down the car; it was practically stopped when it went off, slow speed. I was traveling about 15 miles an hour when I put my brakes on. My brakes were in good order and condition. I had recently had my brakes tested. My lights were on that night; they were in good order and condition; I had recently had the lights tested. Mr. Paret's service station in Lake Charles made the test of my brakes and lights, prior to the accident.

"There was not anyone in the car with me at the time of the accident. I know how I got out of the river after I broke the glass door open and got out through the glass door; I came up and swam to a raft, and got on it, and hollered for help. Stanley Beard, who was working at the Kewpie Ice Cream Company, came to my rescue.

"This was between 9:30 and 10 o'clock on the night of July 3, 1926. I had good lights on my car. It was practically a new car. I had a windshield wiper, working. There was the rain to keep me to some extent from observing what was ahead of me. Those headlights on the Oldsmobile sedan of the character I had, do not throw their light very far in bad weather. I had the standard lights on there, and they were practically new.

They were burning. I could see maybe about 30 or 40 feet ahead of me that night. It was raining awful hard. It was a real hard rain, instead of just an ordinary shower. This was in July. It was real dark; a real dark night. I couldn't say whether it was lightning and thundering or not. I did not see the arc light burning there on the end of the street. I don't know whether they have a white way of lights along Pearl Street on posts about every fifty or a hundred feet. I didn't notice those lights. I couldn't tell at night that the Kewpie Ice Cream house there was a white building. I could tell it was a building. The Kewpie Ice Cream house was well lit up. If it has a large glass window that shines out on the wharf, it wasn't shining on the wharf that night. I say the building was lit up. There is no large glass window that I know of to the east that faces out toward the wharf in that building. The lights were on in the building. When you get to the end of Pearl Street, you go across a shelled portion there before you get on the wharf; you did that night. I saw the dirt, and found out that I was off of the pavement. I saw the dirt piled up there on the side. I saw that pile of dirt. I did not see any stacks of cross ties stacked up all over the wharf. I didn't see any of those at all. If they were stacked there, I didn't see them. I was in the hospital the next day. I did not see that large anchor bitt down there that the large ships that come in tie to, on the edge of the wharf. I didn't notice that I crossed any railroad track in the middle of Austin Street, that runs at right angles to Pearl. I did not notice that railroad track. I did not cross three railroad tracks from there until the time I ran off into the river.

"* * * I had been out to the Idlewild on the Port Arthur road just prior to the time that I ran off down there and plunged my car into the river. The Idlewild was a dance hall. I came back then down Orleans Street; I went out Orleans Street and came back Orleans Street. It was raining when I went out and when I came back. I don't believe it was raining as hard then as it was when I ran into the river. I know now that on Orleans Street at that time were the Hotel Beaumont and the San Jacinto Building and no street car tracks. I did not know it at that time. I didn't notice those buildings particularly when I went by them. I didn't pay any attention then to whether there were double street car tracks on Pearl Street or not, I thought I knew where I was.

"* * * There wasn't any light down there on the corner of Pearl and Austin Street at the end of Pearl Street. There was not any arc light or any street light on the corner. I did not see that. I saw the lights, the building lights, on the side of the road. I don't know whether there was flood lights

playing on the Kewpie Ice Cream building or not.

"* * * I had just been out to Idlewild, had come back to 1235 Magnolia and talked to Mrs. Richardson a while, and then had gone right back. From the time I went down Orleans Street to the Idlewild, from that time till the time I came back and ran off into the river was not over thirty or forty minutes.

"I did see some gravel and shell on Orleans Street; there was a place where they were repairing the street. I know now, but did not know then, that it was right by Buford Street. I guess that is on Orleans Street. That street was not paved on that night all the way from Hotel Dieu clear to the end of Washington Boulevard.

"I saw some lights across the river over there. I would not judge that that is as far as half a mile. I would say it is about a quarter. I could see those lights, but I could not see more than thirty or forty feet in front of my car, down on the ground. I was leaving a well-lighted street, going off the end there into a space a quarter of a mile, where it was dark and raining, and no lights; where I couldn't see over thirty or forty feet in front of my car, and I say I could see those lights over across the river there. That is my testimony."

Martin Richardson testified that he went out to Idlewild with appellee; he said:

"I went out to the Idlewild with him. When he first went out there, I went with him. He was driving his car. We came up Magnolia till we got to Liberty, and we came down Liberty till we got to the Kyle Theatre, and turned to our right and went up Orleans. I was directing him, and when we got out by the hospital, they were doing some construction work of some kind in that block and they had a bunch of brick and lumber and some sand piled there, as well as I remember, and when he said he was coming back from the dance hall, I said 'Well Kane, I won't go with you,' I says, 'You remember that pile of lumber and stuff in the street,' He says, 'Yes.' I says 'When you turn down Orleans Street at the Kyle Theater when you hit that pile of lumber you will know you are all right; just come right on out.'

"That was somewhere around the hospital; I don't know just exactly where it was. That is Hotel Dieu, right across the river there; right around in there somewhere. I called his attention to that as a sort of guide post, because he didn't know the directions in Beaumont, and he wanted to come back and bring my sister home and then come back out and get me. You see, he left me out there, and he was on his way to get me when he went in the river."

Mrs. Nita Richardson testified further that she heard appellee make a statement:

"After they got through stitching his nose on his face, he asked me not to let his mother know about it. I said 'Bill, I am sorry I didn't go with you,' and he said 'When I seen the pile of sand, I thought I was right, and I wasn't.'"

Appellant thus states the duty of a municipal corporation to maintain warning lights, etc., as a protection to those using its streets:

"The duty of a municipal corporation to erect barriers, railings and warning lights around areas adjoining its sidewalks or highways arises out of the duty which rests upon municipal corporations to maintain their streets and sidewalks in safe condition for those persons rightfully using the same. Clark v. City of Richmond, 83 Va. 355, 5 S. E. 369, 5 Am. St. Rep. 281; Chance v. City of St. Joseph, 195 Mo. App. 1, 190 S. W. 24."

On this proposition appellant urges that the authorities are "unanimous in holding that a municipal corporation is required to erect a barrier, railing or warning light on a street only where the area adjoining the street is in such condition as to render the street itself unsafe to travelers lawfully using the same. The dangerous place must be contiguous to the street. Sparhawk v. City of Salem, 1 Allen (Mass.) 30, 79 Am. Dec. 700; Barnes v. Inhabitants of Chicopee, 138 Mass. 67, 52 Am. Rep. 259; Puffer v. Inhabitants of Orange, 122 Mass. 389, 23 Am. Rep. 368; Chance v. City of St. Joseph, supra; Fox v. City of Joplin (Mo. App.) 297 S. W. 449."

In support of this conclusion appellant cites the following authorities: City of Dallas v. Maxwell (Tex. Com. App.) 248 S. W. 667, 27 A. L. R. 927; City of Denison v. Warren (Tex. Civ. App.) 36 S. W. 296; Barnes v. Inhabitants of Chicopee, 138 Mass. 67, 52 Am. Rep. 259; Chapman v. Cook, 10 R. I. 304, 14 Am. Rep. 686; Mary Daily v. City of Worcester, 131 Mass. 452; Murphy v. Inhabitants of Gloucester, 105 Mass. 470; Hudson v. Inhabitants of Marlborough, 154 Mass. 218, 28 N. E. 147; Sparhawk v. City of Salem, 1 Allen (Mass.) 30, 79 Am. Dec. 700; Irwin v. Byron Township, 183 Mich. 345, 149 N. W. 980; Puffer v. Inhabitants of Orange, 122 Mass. 389, 23 Am. Rep. 368; Short v. State, 109 Misc. Rep. 617, 179 N. Y. S. 539; Crogan v. Schiele, 53 Conn. 186, 1 A. 899, 5 A. 673, 55 Am. Rep. 88; Herndon v. Salt Lake City, 34 Utah, 65, 95 P. 646, 131 Am. St. Rep. 827; Clark v. City of Richmond, 83 Va. 355, 5 S. E. 369, 5 Am. St. Rep. 281; Chance v. City of St. Joseph, 195 Mo. App. 1, 190 S. W. 24; Fox v. City of Joplin (Mo. App.) 297 S. W. 499; 29 C. J. 688 et seq.

The general proposition as stated by appellant is correct and has full support in the authorities cited. But these authorities do not support the proposition that "the dangerous place must be contiguous to the street." Without the support of this proposition the

issue of negligence was raised against appellant. Most, if not all, of appellant's cases turn upon the proximity of the danger to the street or road, but that was because, as said in Sykes v. Town of Pawlet, 43 Vt. 446, 5 Am. Rep. 295, "the condition of the highway neither forced the plaintiff there, nor led him to go there," or the cases fall within the following rule announced by 29 C. J. 688, 690, cited by appellant:

"Where the condition of a highway is such as in itself to give notice that the way is not open to public travel, it is not necessary to place barriers there."

■ But what is the rule where the condition of the street or road does not give notice that it "is not open to public travel" or forces or leads the public into danger. On such facts we approve the rule announced in Barnes v. Inhabitants of Chicopee, 138 Mass. 67, 52 Am. Rep. 259, where it was said:

"In determining whether a defect is in such close proximity to the highway as to render traveling upon it unsafe, that proximity must be considered with reference to the highway 'as traveled and used for the public travel,' rather than as located."

And in Crogan v. Schiele, 53 Conn. 186, 1 A. 899, 901, 5 A. 673, 55 Am. Rep. 88, where it was said:

"We think that in making the defendant's liability to depend upon the dangerous condition in which the excavation was left by the defendant, rather than upon its distance from the street, the judge adopted the true criterion. It is the dangerous character, rather than the exact location, of the excavation that determines the duty and consequent liability of the defendant in this respect. Whether the excavation could, with a due regard to the rights of passengers on the street, be left unguarded, or could not, depended upon the question whether, being unguarded, it endangered the travel or not. If it did not, no matter how near it was to the line of way, if it did, no matter how far it was removed."

The facts of this case bring it clearly within this rule and clearly take it out of the rule contended for by appellant. Thus, as testified by Mrs. Richardson, Pearl street on a dark and rainy night had the appearance of continuing across the approach to the wharf. Dale Broussard testified that traveling down Pearl street south on a dark and rainy night the river could not be seen from a motor vehicle. Dr. Tatum stated that a stranger driving down Pearl street on a dark and rainy night not knowing of the right angle turn into Austin street might drive across the wharf. Appellee testified that the approach to the wharf appeared to him to be a continuation of Pearl street. The dirt on the right and the ties on the left across Austin street added to the delusion by making an open lane that led straight into the river. On these facts the condition of Pearl street not only did not give appellee notice of the danger he was about to drive into, but in fact "led him to go there." Appellant was not entitled to an instructed verdict, but the issue of negligence was one for the jury.

The court charged the jury that:

"Cities are not obligated to erect barriers or warning lights to prevent or warn travelers from straying from the street," and that "the railing, barrier or warning light is requisite only to make the street itself reasonably safe and reasonably convenient for persons using ordinary care to travel thereover."

■ On the theory of law thus presented to the jury, appellant insists that the verdict convicting it of negligence in failing to have guard rails or barriers at the end of Pearl street was "so contrary to the law in the case as laid down in the court's charge, that the verdict should have been set aside and a new trial granted as requested by defendant, but in which the court committed reversible error by overruling." This proposition is overruled. The issue of negligence was clearly raised by the testimony. While the court's charge may not have stated the law with accuracy, yet in following it the jury did not err in convicting appellant of negligence.

■ Appellant's third proposition is to the effect that as a matter of law appellee was guilty of contributory negligence:

"In failing to observe and discover that he had left the smooth well paved and well lighted city street and had dropped off into a rough, bumpy shell portion of the wharf of the City of Beaumont over which he had to drive for a distance of 70 feet, and then encountered a plank decking 65 feet wide before reaching a place of danger, said distance of 135 feet being strewn with stacks of crossties from 6 to 8 feet high, and a large embankment of debris, between which was a narrow passageway through which plaintiff had to go to reach a place of danger at the end of said passageway, there being a large anchor bitt made of iron some 10 inches high and some 40 inches long plainly visible on the decking of said wharf in front of the path of plaintiff's automobile, and it being shown that plaintiff's automobile had good lights, a windshield wiper, and good brakes, such facts show as a matter of law that plaintiff was guilty of contributory negligence in not discovering and observing that he had strayed from the street and was approaching a place of danger."

That appellee was not guilty of contributory negligence as a matter of law, on the facts disclosed by appellee's testimony, copied supra, is sustained by the holding of this court in Beaumont, S. L. & W. Railway Co. v. Sterling, 260 S. W. 320.

■ By its fourth, fifth, and sixth propositions appellant complains of the form of the question submitting the issue of contributory negligence:

"Because such issue makes the determination of plaintiff's negligence or want of ordinary care depend upon what he observed or discovered after he had driven off the street and onto the walk and ignores the negligence of plaintiff, if any, in not discovering that the street ended at such time and place that he could, by the use of reasonable diligence, have avoided driving off the street."

This question was as follows:

"Do you find from the evidence that plaintiff on the occasion in question failed to use reasonable care for his own safety. in failing to observe or discover that he had driven his automobile off of the street and on to the wharf?"

These propositions are overruled. The issue of contributory negligence, as submitted, was in strict accordance with the theory of contributory negligence plead by appellant. The pleading was as follows:

"Had he been exercising ordinary care for his own safety he should and could have discovered, by the use of ordinary care, that he had passed the terminus of said street, and that he was approaching the water's edge, all of which negligence on the part of the plaintiff proximately caused and contributed to cause the plaintiff's injuries and damages, if any he suffered."

By questions 9, 10, 11, 12, 13, and 14, the jury was asked the rate of speed appellee was traveling immediately before he ran into the river and whether such rate of speed was contributory negligence; whether appellee, after actually discovering that Pearl street ended with Austin street, applied his brakes for the purpose of stopping his automobile, and whether his conduct in relation thereto was negligence; and whether he had his automobile under proper control at the time he reached the end of Pearl street and whether his failure to have his automobile under control was negligence. These questions were excepted to on the ground that appellee's negligence was made to depend upon what he did after he actually discovered that Pearl street ended at Austin street and "in not sooner discovering that Pearl Street ended at Austin Street." These exceptions to the charge were properly overruled because, as just stated, these issues submitted appellant's theory of contributory negligence.

■ By propositions 7, 8, 9, and 10 appellant complains of the following argument of Hon. C. W. Howth, attorney for appellee, as he addressed the jury:

"Morris would certainly be delighted to have you find that this was an unavoidable accident. * * * The jury is bound to know that the City of Beaumont is trying to defeat this claim on the ground that Kane was drunk. * * * We want the jury to find that the City was negligent in not erecting a barrier. * * * We want you to read these issues carefully and find that the City was negligent, that Kane was not guilty of contributory negligence and that he was not drunk."

This argument was in no wise objectionable. Mr. Morris, as already stated, was city attorney and represented appellant in the trial of this case. The pleadings showed that he had raised for the city the issue of "unavoidable accident." That being his pleading, it could not have been injurious to appellant for Mr. Howth to tell the jury that Mr. Morris "would certainly be delighted to have you find that this was an unavoidable accident." Again, much testimony had been offered on the issue that appellee was drunk at the time he drove his car into the river. In questioning the witnesses Mr. Morris had stressed that point; he had asked them if the effect of a plunge in twenty-three feet of water would not be likely to sober up a drunken man. On this state of the record it was not injurious for Mr. Howth to tell the jury that appellant was trying to defeat appellee's claim "on the ground that Kane was drunk." Again, appellee had specially pleaded that the city was negligent "in not erecting a barrier." That being his pleading, he had the right to ask the jury to find that issue in his favor. Again, appellee had pleaded that the city was guilty of negligence. He had offered evidence that he was not drunk and that he was not guilty of contributory negligence. In asking the jury to find these issues in favor of his client, counsel did appellant no wrong. Counsel certainly has the right to read the court's charge to the jury and to advise the jury how, as issues of fact, he wants the questions answered. What the law condemns is the action of counsel in telling the jury the effect of its answers. This is clearly illustrated by the opinion of the Commission of Appeals answering certified questions from this court in McFaddin v. Hebert, 15 S.W.(2d) 213. Appellee has replied to these propositions by saying that the bills do not negative the idea that the remarks complained of were called for by the evidence or were in response to or provoked by the argument of opposing counsel, and that no written request was made for an instruction to the jury not to consider such arguments. These counter propositions we do not consider further, because there is no merit even on the face of appellant's propositions.

■ By its eleventh proposition appellant complains of appellee's testimony "as to the appearance to him of the situation when he reached the end of Pearl Street"; by the

twelfth proposition complaint is made of appellee's testimony "that he believed he was on the same street that he had traveled only a few hours before"; by the thirteenth proposition complaint is made of the testimony of the witness Mrs. Nita Richardson "in which she stated that it appeared to her that Pearl Street continued as far as she could see"; by the fourteenth proposition complaint is made of the testimony of Dale Broussard, in which he stated that "the people generally used the shelled space at the end of Pearl Street as a part of Pearl Street"; by the fifteenth proposition complaint is made of the testimony of Dr. W. E. Tatum "that the situation at the end of Pearl Street presented such an appearance that a stranger on a rainy night would be liable to drive off into the river." All this testimony was objected to on the ground that it was mere opinions or conclusions on the part of the witnesses as to the conditions existing at the Pearl-Austin street crossing. These objections are all overruled. It was permissible for appellee to show not only the physical facts but the effect of such facts upon persons using the street. Appellant charged appellee with contributory negligence. To meet that issue it was his privilege to show that he acted; under the circumstances, as an ordinarily prudent man would have done under the same circumstances. The appearance of the approach to the wharf between Austin street and the river was a vital issue. Therefore these witnesses could testify that it had the appearance of being an extension of Pearl street and that a stranger might drive off into the river believing that he was on Pearl street. This court, in Aetna Life Insurance Co. v. Robinson, 262 S. W. 118, 122, discussing this proposition, said:

"Of course, this testimony of the witness was a mere conclusion, but when it is not possible for a witness to picture in words the scene as it actually existed, the general rule permits him to testify as to the impression produced upon his mind by the facts as he saw them."

In Magee v. Paul, 110 Tex. 470, 221 S. W. 254, 258, Judge Greenwood, speaking for the Supreme Court, said:

"When the opinion is the mere shorthand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based."

By the sixteenth proposition it is insisted that the court erred in permitting the introduction "of the testimony of Lock Paret given at a former trial of this case, which testimony was material to the issues of the defendant's negligence and the result of damages, because it was hearsay testimony and no proper predicate was laid for its admission." On the former trial of this case, Lock Paret, in person, testified on the issue of the

difference between the market value of the car immediately before it was damaged and immediately thereafter. He also testified as to the condition of the brakes and the lights on the car some two or three days before the accident. Upon this trial this testimony was reproduced by placing the stenographer upon the stand and having him read to the jury the questions asked the witness and the answers given by him on the former trial. Appellant's objection to this testimony was that it was "hearsay testimony and no proper predicate was laid for its admission and was prejudicial to the defendant." There is no recitation in the bill of exceptions as to the predicate that was laid for the admission of this testimony. The trial court qualified this bill as follows:

"The record in this case shows that at the time it was sought to introduce the testimony of Lock Paret taken on a former trial, that the said Lock Paret was out of the jurisdiction of this court, to-wit: In the City of Lake Charles, Calcasieu Parish, Louisiana. That the said Lock Paret was the same Lock Paret that had testified in the former trial; that said testimony of Lock Paret was taken in a former trial of this case in this court, between the same parties, involving the same issues, and for the same purposes; that said testimony in toto, the direct examination, cross examination and redirect examination was offered by plaintiff; that upon the trial of this cause on the occasion herein and on the day after the said testimony on the former trial was introduced in evidence herein the attorneys for the plaintiff tendered Lock Paret in open court, had him sworn and placed him on the witness stand and tendered him for examination and the attorneys for the defendant had ample opportunity to fully cross examine the said Lock Paret, but failed and refused to avail themselves of this opportunity; and said attorneys for defendant objected to plaintiff's motion to withdraw the testimony of Lock Paret on the former trial and to instruct the jury not to consider the same, and further objected to plaintiff's examination of the said Lock Paret in open court."

By refusing a writ of error in Morris v. Davis (Tex. Civ. App.) 292 S. W. 574, 576, the Supreme Court approved the rule that testimony of an absent witness may be reproduced upon certain conditions. To show error it was necessary that the bill affirmatively exclude these conditions. This showing was not made by this bill; therefore, it does not disclose error. However, it is not necessary to rest this ruling upon a technical construction of the bill of exceptions. It appears from the record and the court's qualification to the bill that the next morning after this testimony was received by the court over appellant's objections, appellee offered as a witness Lock Paret in person and proposed to prove by him the same facts

involved in his testimony reproduced by the court stenographer. Upon appellant's exceptions the trial court refused to allow the witness to testify in person on these issues. Thereupon appellee moved to withdraw all the former testimony on this issue in order that he might introduce Lock Paret in person. This motion was overruled on exceptions of appellant. Appellee then tendered Lock Paret to appellant for cross-examination on this issue, which tender was refused. On this showing appellant's proposition does not constitute error. In Missouri, K. & T. Railway Co. v. St. Clair, 21 Tex. Civ. App. 345, 51 S. W. 666, 667 (writ of error refused), it was held that error in permitting a witness's deposition to be read where he afterwards appeared and testified was harmless. The court said:

"However, no harm could possibly have been done defendant thereby, for at a later stage of the trial plaintiff went upon the stand, and testified, and was cross-examined by defendant."

The tender of the witness Lock Paret in person certainly met all the conditions of the case just cited.

In further support of this conclusion, it was judicially determined by Morris v. Davis, supra, that "the Legislature has not given testimony taken at a former trial the same dignity as that produced by deposition." So if the erroneous reception of testimony by deposition is rendered harmless by the appearance of the witness, it must be said that the tender of the witness to meet the objections urged by appellant rendered the introduction of his former testimony harmless.

Appellant's seventeenth and last proposition is that the verdict of $11,500 is excessive. This proposition is overruled. Under appellee's testimony he was making $250 a month before his injury, as an oil driller. In the accident he suffered a serious injury to his left hand by reason of which he is not able to pursue his former occupation. Since his injuries he has not been able to make more than $150 a month, and under his testimony will never be able to pursue his former occupation. This testimony alone establishes a loss of $100 a month, which would amount to at least $5,000 from the date of the injury up to the present time. In addition to this loss in earning capacity, he has an impaired hand and a serious injury to his nose. He testified:

"My health before I was injured was good. I did not suffer with any headaches or uncomfortable feelings of any sort prior to my injury at any time. Since the injury I have headaches and nervousness. I have the headaches and nervousness at different times: two or three times a week. Sometimes it lasts around a day, to a few hours sometimes.

I wouldn't know whether it is pain that I suffer during that time that I have these nervous spells and headaches, or not; I just get nervous and can't hardly stand around. The headache is painful.

"The injury to my hand and to my nose caused pain. I suffered pain from my injury to my hand and my nose around a couple of months. I have pain now in my head and nose and hand. As to how frequently I have those pains, I will say my head is noisy; and it will gag you often in the morning, when you get up, from the nose. I don't breathe through my left nostril at all; the left side is closed up."

He described the injury to his nose as follows:

"In addition to the hand injury, the end of my nose is cut down to the lip, and the nose is broken across here (indicating)."

Also, he was confined to his bed for some time after the injury. The verdict has full support in the facts.

Finding no error in the record, it is our order that the judgment of the lower court be, and the same is hereby, in all things affirmed.